**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Dixie Overton, | No. CV-22-01450-PHX-GMS |
| Plaintiff, | **ORDER** |
| v. | |
| Alejandro N. Mayorkas, Secretary of U.S. Department of Homeland Security, | |
| Defendant. | |

Pending before the Court are Defendant Alejandro N. Mayorkas's Motion for Summary Judgment (Doc. 62) and Motion to Seal (Doc. 64).  Also pending is Plaintiff Dixie Overton's Motion to Seal (Doc. 70).  For the following reasons, Defendant's Motion for Summary Judgment is granted, and both Motions to Seal are denied.

## BACKGROUND

Plaintiff Dixie Overton is a current employee[1] of the United States Department of Homeland Security (DHS), Immigration and Customs Enforcement.  (Doc. 1 at 1).  She is female and a single mother.  (*Id.*).  Overton filed this lawsuit against Defendant Alejandro N. Mayorkas in his official capacity as the Secretary of DHS and brings disparate treatment, retaliation, and hostile work environment claims against DHS.  (*Id.* at 1, 10-12).

Overton began employment at DHS on January 26, 2014.  (Doc. 1 at 4).  Karl

---

[1] At oral argument, Overton's attorney stated that Overton resigned from DHS on August 17, 2020 and returned to DHS on June 20, 2021.  For all relevant times in this case, Overton was employed at DHS.  (Doc. 1 at 1).

1    Kirk was her direct supervisor for the entirety of her employment.  (Doc. 72 at 1).

2    In November 2018, Overton applied to a Management Program Analyst (MPA)

3    position at DHS.  (Doc. 73 at 9).  The hiring panel for that position included Kirk and two

4    other employees.  (*Id.*; Doc. 73-2 at 70 of 76).  During the first step of the hiring process,

5    which involved reviewing and grading the candidates' resumes, the Complaint alleges that

6    Kirk directed the other members of the hiring panel to lower their original scores for

7    Overton's resume.  (Doc. 73 at 9).  Based on a unanimous decision, the hiring panel did

8    not select Overton for the MPA position at that time.  (Doc. 73 at 9; Doc. 73-2 at 76 of 76).

9    While Kirk was a supervisor at DHS between 2018 and 2019, employees brought

10   allegations against Kirk regarding workplace harassment and misconduct.[2]  (Doc. 73 at 2).

11   The allegations included that he belittled single moms, (Doc. 73 at 2; Doc. 71-9 at 2 of 3),

12   exhibited "harassing punching behaviors," (Doc. 73 at 2; Doc. 71-14 at 4 of 4), made

13   inappropriate comments, (Doc. 73 at 2; Doc. 73-2 at 18 of 76), and kicked a door (Doc. 73

14   at 2; Doc. 73-6 at 11 of 28).  Kirk also allegedly sent a picture of his wife in a bikini to

15   employees at DHS.  (Doc. 73 at 10; Doc. 73-3 at 12 of 27).   Katrina Kane, a fellow

16   employee at DHS, met with Kirk in 2019 to address this alleged behavior.  (Doc. 73 at 2;

17   Doc. 71-23 at 2).  The Office of Professional Responsibility (OPR) at DHS investigated

18   the allegations against Kirk.  (Doc. 73 at 2-3; Doc. 63-2 at 25-26 of 114).  Based on OPR's

19   investigation, DHS charged Kirk with "Failure to Follow Instructions," because Kane

20   warned Kirk not to shadowbox near employees but Kirk continued to do so, and

21   "Inappropriate Conduct," because of Kirk's alleged statements, shadowboxing, and

22   sending of inappropriate pictures to employees.  (Doc. 73 at 2-3; Doc. 73-2 at 19-20 of 76).

23   DHS suspended Kirk for two days because of these charges.  (Doc. 73 at 3; Doc. 73-6 at

24   10 of 28).

25   On March 6, 2020, Overton filed an Equal Employment Opportunity (EEO)

26   complaint against Kirk, alleging gender discrimination.  (Doc. 73 at 4; Doc. 71-2 at 2-4 of

---

27   [2] Two female employees, who filed EEO complaints against Kirk, eventually quit their jobs
28   at DHS.  (Doc. 73-4 at 7-8 of 34; Doc. 73-2 at 32-33 of 76).  In total, eight employees,
     whom Kirk supervised, quit their jobs, and six of those employees were women.  (Doc. 73
     at 4; Doc. 73-4 at 7-9 of 34).

4).  Kane worked to resolve Overton's EEO complaint, which resulted in the execution of a settlement agreement on April 13, 2020.  (Doc. 73 at 4; Doc. 73-6 at 21-22 of 28).  One of the terms of the settlement agreement involved promoting Overton to an MPA position. (Doc. 73 at 4; Doc. 71-3 at 2 of 6).

On April 14, 2020, Kirk issued a "letter of reprimand" to Overton because of her arrest that occurred a year and a half earlier.  (Doc. 73 at 5; Doc. 71-10 at 2-4 of 4).  On September 22, 2018, Overton had been arrested based on allegations that she committed domestic violence.  (Doc. 1 at 4).  Overton had reported the arrest to Kirk the next day on September 23, 2018.  (Doc. 73 at 4).  One month after Overton's arrest, the prosecutor dropped the charges.  (Doc. 1 at 4).  The Administrative Inquiry Unit (AIU) of DHS investigated Overton's arrest and concluded its investigation on July 3, 2019.  (Doc. 73 at 4).  In April 2020, DHS instructed Kirk to make a final decision on whether to discipline Overton for the arrest.  (Doc. 73 at 5; Doc. 73-2 at 25-26 of 76).  In deciding what action to take, Kirk consulted with a specialist, who recommended that Kirk issue a letter of reprimand, which is the "most common outcome in cases where an employee is arrested." (Doc. 73 at 5; *see* Doc. 73-2 at 26-27 of 76).

On June 7, 2020, DHS promoted Overton from Mission Support Specialist (MSS) to the MPA position.  (Doc. 73 at 6; Doc. 63-1 at 12 of 160).  After her promotion to the MPA position, Kirk allegedly required Overton to continue her MSS duties.  (Doc. 73 at 6; Doc. 71-27 at 2 of 2).  The only training that Overton allegedly received for the MPA position involved Kirk helping her read and analyze data over the course of two weeks.  (Doc. 73 at 7).  Jay McClain, the only other person at the time who held an MPA position at DHS, allegedly received four hours of training per day over the course of two months from Kirk and another employee.  (Doc. 73 at 7; Doc. 73-2 at 54, 59-60 of 76). Kirk also allegedly was present at McClain's cubicle more often than he was at Overton's cubicle.  (Doc. 73 at 11; Doc. 73-4 at 17 of 34).  Kirk testified that he and other employees had trained Overton "starting back in 2016."  (Doc. 73 at 7; Doc. 73-2 at 50 of 76).

On June 17, 2020, Kirk issued Overton a "Performance Work Plan" (PWP).

(Doc. 73 at 8; Doc. 71-11 at 3 of 3).  Overton communicated to Kirk that the PWP contained unrealistic goals and that she would not have enough time to review it.  (Doc. 73 at 8).  Kirk gave the same PWP to both McClain and Overton.  (*Id.*; *see* Doc. 71-12).

On June 19, 2020, Overton emailed Kirk and Kane "requesting additional time to review the PWP, asking for the meeting that day to be rescheduled, and requesting the presence of a female supervisor during" the meeting about the PWP.  (Doc. 73 at 8).  Kirk did not bring a female supervisor to the meeting, but he brought a third-party male supervisor instead.  (*Id.*).

Kirk also allegedly criticized Overton's performance in emails with other employees copied, (Doc. 73 at 9; Doc. 71-1 at 4-5 of 11), and contacted Overton on her personal cell phone while she was on leave from work,  (Doc. 73 at 10; Doc. 63-1 at 39 of 160).

Overton filed a Complaint against DHS on August 26, 2022, raising Title VII claims of disparate treatment, retaliation, and hostile work environment.  (Doc. 1).  On March 29, 2024, DHS filed a Motion for Summary Judgment (Doc. 62), seeking to dismiss all three claims.  On that same day, DHS filed a Motion to Seal (Doc. 64), requesting to file under seal 15 of the 23 exhibits in support of its Motion for Summary Judgment.  Plaintiff also filed a Motion to Seal on June 28, 2024 (Doc. 70), concurring with Defendant's Motion to Seal and requesting to file under seal 29 of the 35 exhibits in support of Plaintiff's Statement of Facts.

## DISCUSSION

### I.   Motion for Summary Judgment

#### a.  Legal Standard

A court must grant summary judgment if the pleadings and supportive documents, viewed in the light most favorable to the non-moving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  On a motion for summary judgment, the movant bears the burden of establishing the

absence of genuine issues of material fact. *Celotex*, 477 U.S. at 323; *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). If the movant "carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id.* at 1103. "If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Id.*

There is no issue for trial unless sufficient evidence favors the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249-50. Nevertheless, the non-movant's evidence is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254. Ultimately, "the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant." *Id.* at 255.

### i. Disparate Treatment Claims

To prove disparate treatment under Title VII, Overton must first establish a prima facie case of discrimination under the *McDonnell Douglas* framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). To establish a prima facie case of discrimination, Overton must show (1) she belongs to a protected class; (2) she was performing according to her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees were treated more favorably or other circumstances surrounding the adverse employment action give rise to

1   an inference of discrimination.  *Reynaga v. Roseburg Forest Products*, 847 F.3d 678, 691

2   (9th Cir. 2017) (citing *McDonnell Douglas*, 411 U.S. at 802).

3       If Overton succeeds in establishing a prima facie case, the burden of production

4   shifts to DHS to articulate a legitimate, nondiscriminatory reason for taking the adverse

5   employment action.  *Aragon v. Republic Silver State Disposal Inc.*, 292 F.3d 654, 658 (9th

6   Cir. 2002) (citing *McDonnell Douglas*, 411 U.S. at 802).  If DHS does so, Overton must

7   then demonstrate that DHS's articulated reason is a pretext for unlawful discrimination by

8   "either directly persuading the court that a discriminatory reason more likely motivated the

9   employer or indirectly by showing that the employer's proffered explanation is unworthy

10  of credence."  *Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1124.  (9th Cir. 2000).

11  Overton's evidence "must be both specific and substantial to overcome the legitimate

12  reasons" set forth by DHS.  *Aragon*, 292 F.3d at 659.

13      Overton offers five theories of how DHS "subjected [Overton] to adverse

14  employment actions and treated her differently than similarly situated employees outside

15  of her protected class."  (Doc. 72 at 11).  For the reasons set forth below, Overton's

16  disparate treatment claim, under any of these theories, does not withstand Defendant's

17  Motion for Summary Judgment.

18                    **1.  Less Training**

19      Overton first argues that DHS discriminated against her because DHS "gave Jay

20  McClain better, longer, more robust training for the MPA position" than she received.

21  (Doc. 72 at 11).  Overton, however, fails to make out a prima facie claim of disparate

22  treatment under this theory because Overton does not establish an adverse employment

23  action.

24      Overton contends that the only training she received for the MPA position involved

25  Kirk "helping her read and analyze data" over the course of two weeks.  (Doc. 73 at 7).

26  Overton argues that she received less training than the male employee in the same position,

27  because he received four hours of training each day over the course of two months.  (Doc.

28  73 at 7; Doc. 73-2 at 54, 59-60 of 76).  Overton also points to Kirk's testimony, however,

1    that he and other employees at DHS had provided training to Overton for many years
2    "starting back in 2016."  (Doc. 73 at 7; Doc. 73-2 at 50 of 76).

3         Overton does not cite a single case to support the proposition that a female employee
4    receiving less training than a male employee in the same position constitutes an adverse
5    employment action.  (*See* Doc. 72 at 10-13).  Nor was the Court able to find one.  Rather,
6    federal courts have consistently recognized that less training, or even failure to train, itself
7    does not amount to an adverse employment action.  *C.f. Brooks v. Firestone Polymers*,
8    L.L.C., 640 Fed. Appx. 393, 397 (5th Cir. 2016) (holding that "failure to train" alone "does
9    not constitute an ultimate employment decision or an adverse employment action"); *Hill v.
10   Rayboy-Brauestein*, 467 F.Supp.2d 336, 352 (S.D.N.Y. 2006) ("When an employee cannot
11   show material harm from a denial of training, such as a failure to promote or a loss of career
12   advancement opportunities, there is no adverse employment action."); *Roberson v. Game
13   Stop, Inc.*, 395 F.Supp.2d 463, 469 (N.D. Tex. 2005) (holding that "failure to train" does
14   not constitute an adverse employment action "where the alleged failure to train an
15   employee is one of adequacy and where no formal program of training exists"); *but see
16   Clay v. United Parcel Service*, 501 F.3d 695, 710 (6th Cir. 2007) (holding that "deprivation
17   of increased compensation as the result of a failure to train constitutes an adverse
18   employment action").

19        Nor does Kirk's more frequent presence at McClain's cubicle amount to an adverse
20   employment action.  *See Fushi v. Bashas' Inc.*, No. CV-10-02519, 2013 WL 231048, at *3
21   (D. Ariz. Jan. 22, 2013) ("To the extent that [plaintiff] alleges that she was discriminated
22   against by [a fellow employee] because he would sometimes converse more with male
23   employees than with the females . . . such behavior . . . even if true, does not amount to an
24   adverse employment action.").

25        The alleged facts, even viewed in the light most favorable to Overton, do not give
26   rise to an inference of discrimination.  Overton does not provide any evidence to show that
27   the lack of training was due to her gender, or that lack of training limited her opportunities
28   or, itself, resulted in other adverse action.    Accordingly, this theory fails because Overton

does not establish a prima facie case of disparate treatment.

## 2. Interference with Promotion

Overton next argues that DHS discriminated against her because "Kirk interfered" with her opportunity for a promotion "to the MPA position in 2018." (Doc. 72 at 11). Overton alleges that, during the first step of the hiring process for the MPA position, Kirk directed other members of the hiring panel to lower their scores for Overton's resume, and "[a]s a result of the lower score, [DHS] selected a male for the MPA position." (Doc. 72 at 13). Overton fails to make a prima facie case of gender discrimination under this theory, however, because she does not provide admissible evidence that Kirk directed other members of the hiring panel to lower their scores for Overton's resume during the first step of the hiring process or that any of the members of the hiring panel in fact lowered their scores. (Doc. 73 at 9).

Although Overton alleges in her Response to Defendant's Motion for Summary Judgment that Kirk directed the other members of the hiring panel to lower their scores for Overton's resume, (Doc. 72 at 13), Overton also alleges in her Statement of Facts that "Kirk did not specifically tell [another member of the hiring panel] to lower [Overton's] score, but his behavior led her to believe that is what he wanted her to do." (Doc. 73 at 9). Overton points to Exhibit 12, where a member of the hiring panel in fact states in a sworn affidavit that "Kirk did not specifically advise me to lower [Overton's] resume score." (Doc. 71-6 at 3 of 8). According to Exhibit 12, the member of the hiring panel states, "I felt like [Kirk] desired that we change our resume scores, but he did not state that specifically, and I did not change my scoring." (Doc. 71-6 at 4 of 8). Thus, Overton's allegation that Kirk directed the panel to lower their scores and interfered with Overton's candidacy for the promotion is not supported in the record. To the contrary, the record indicates that Kirk did not direct the members of the panel to lower their scores of Overton's resume, and the members of the panel did not lower their scores of Overton's resume. (*See* Doc. 71-6 at 3-4 of 8). As such, Overton raises no genuine dispute of material fact regarding whether Kirk interfered with her promotion.

Even if, viewing the facts in the light most favorable to Overton, Overton was able to establish a prima facie case of discrimination, Overton does not create any genuine dispute of material fact regarding DHS's legitimate, non-discriminatory reason for interfering with Overton's promotion. *See Chuang*, 225 F.3d at 1124. DHS articulated that the other male employee, who received the promotion to the MPA position in 2018, was "more qualified than" Overton. (Doc. 62 at 9). Specifically, DHS describes how the other male employee had "extensive experience in computers, spreadsheets, and power point presentations from past positions as well as program management experience," that he had "mastered" a complex ICE database regarding commercial air operations, was "very methodical," and that he provided "very proficient and accurate weekly reporting of commercial removals." (*Id.*).

Overton has raised no genuine dispute of material fact that DHS's articulated reason is a pretext for unlawful discrimination. Overton does not provide any evidence to suggest that the chosen candidate did not have the credentials highlighted by DHS. Moreover, Overton herself states that Kirk directed the hiring panel to lower their scores of Overton's resume because he was "upset" that the other members of the hiring panel had scored Overton's resume as a joint exercise between the two of them, instead of individually. (Doc. 72 at 13). Overton has not pointed to any evidence that indicates a "discriminatory reason more likely motivated [Kirk] or indirectly by showing that the [Kirk]'s proffered explanation is unworthy of credence." *Chuang*, 225 F.3d at 1124.

Accordingly, Overton does not establish a prima facie case of gender discrimination under this theory. Even if Overton did establish a prima facie case of gender discrimination, Overton raises no genuine dispute of material fact that DHS's legitimate, non-discriminatory reason is pretextual. As such, this theory for a disparate treatment claim fails.

### 3. Remaining Theories of Disparate Treatment

Overton additionally asserts the following three theories of disparate treatment: "Kirk made her continue performing the duties of her former position;" Overton's "request

1  to have a female supervisor present for her meetings was denied;" and "Kane made gender-

2  based, insulting statements to her." (Doc. 72 at 11). Overton does not provide any

3  argument or further factual basis for these theories, nor does Overton cite authority to

4  support the proposition that any of these actions constitute disparate treatment. (*See id.* at

5  10-14). Accordingly, Overton has raised no genuine dispute of material fact regarding

6  whether these actions constitute disparate treatment, and as a result, these remaining

7  theories fail. Therefore, the Court grants Defendant's Motion for Summary Judgment on

8  the disparate treatment claim.

9  **ii.  Retaliation Claim**

10  A retaliation claim under Title VII follows the same *McDonnell Douglas* burden-

11  shifting framework discussed above. *Equal Employment Opportunity Com'n v. Swissport*

12  *Fueling, Inc.*, 916 F.Supp.2d 1005, 1028 (D. Ariz. 2013). To make out a prima facie case

13  of retaliation, Overton must show that (1) she engaged in protected activity; (2) DHS

14  subjected her to an adverse employment action; and (3) a causal link exists between the

15  protected activity and the adverse action. *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir.

16  2000). Once Overton establishes a prima facie retaliation claim, "the burden shifts to

17  [DHS] to articulate a legitimate nondiscriminatory reason for its decision." *Id.* If DHS

18  articulates such reason, Overton must demonstrate a genuine issue of material fact as to

19  whether the reason advanced by DHS was a pretext for a discriminatory motive. *Brooks*,

20  229 F.3d at 928.

21  To begin, Overton has shown that she engaged in protected activity. Overton filed

22  an EEO Complaint, alleging gender discrimination, against Kirk on March 6, 2020. (Doc.

23  73 at 4; Doc. 71-2 at 2-4 of 4); *see Boswell v. Potter*, 51 Fed. Appx. 661, 663 (9th Cir.

24  2002) (finding that employee "clearly engaged in a protected activity by filing EEO

25  complaints").

26  Overton has failed to show, however, that DHS subjected her to an adverse

27  employment action. An adverse employment action involves any decision by an employer

28  that affects "compensation, terms, conditions, or privileges of employment." 42 U.S.C. §

2000e–2(a)(1).  Overton contends that the letter of reprimand, issued by Kirk on April 14, 2020, constitutes an adverse employment action.  (Doc. 72 at 7-9; Doc. 71-25 at 2 of 2). "A letter of reprimand may constitute an adverse employment action." *Silva v. Chertoff*, No. CV 04-220, 2007 WL 1795786, at \*7 (D. Ariz. June 20, 2007) (citing *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634 (9th Cir. 2003)).  But the Ninth Circuit has held that "a negative evaluation that does not remain in the employee's file is not an adverse employment action." *Alexander v. Principi*, 16 Fed. Appx. 755, 758 (9th Cir. 2001). Moreover, a letter of reprimand does not constitute an adverse employment action, where the letter of reprimand remained in the employee's file temporarily and the employee faced no actual employment consequences from the letter.  *Silva*, 2007 WL 1795786, at \*7 (holding that a letter of reprimand "does not constitute an adverse employment action" because the letter remained in the employee's file "for a period not to exceed eighteen months" and "there was no employment consequence as a result of the letter"); *but see Principi*, 16 Fed. Appx. at 758 (finding an adverse employment action where employee "was given a letter of reprimand and suspended").

Here, Overton does not allege that she experienced any employment consequences as a result of the letter of reprimand, and the letter remained in her file only temporarily. Overton points to the letter of reprimand itself, which states that the letter was to remain in Overton's employee file "for a period not to exceed two (2) years from the date that it was issued."  (Doc. 71-25 at 2 of 2).  And rather than allege that the letter resulted in any employment consequences, Overton alleges that she was promoted shortly after the issuance of the letter.  Kirk issued the letter of reprimand on April 14, 2020, and DHS promoted Overton to the MPA position on June 7, 2020.  (Doc. 71-10 at 2 of 4; Doc. 63-1 at 12 of 160).  Although Overton highlights that the letter warns "more serious disciplinary action, up to and including [Overton's] removal from the Federal service may be initiated if [Overton] engage[s] in similar misconduct in the future," the use of such language does not amount to an adverse employment action.  *Silva*, 2007 WL 1795786, at \*7 (finding that a letter of reprimand does not constitute an adverse employment action, even where the

letter "contains harsh language and advises [employee] that any future misconduct may result in severe disciplinary action"); *see also Nunez v. City of Los Angeles*, 147 F.3d 867, 875 (9th Cir. 1998) (holding that "threats and harsh words are insufficient" for an adverse employment action).

To be sure, federal courts require a plaintiff to allege additional employment consequences in order for a letter of reprimand to constitute an adverse employment action. *C.f. Melton v. U.S. Dept. of Labor*, 373 Fed. Appx. 572, 578 (6th Cir. 2010) (holding that a warning letter was not "discipline" and "not actionable as retaliation" where the letter had no effect on employee's condition of employment); *Harris v. Potter*, 310 F.Supp.2d 18, 21 (D.D.C. 2004) ("Courts in this Circuit have held that formal letters of admonishment and disciplinary notices that have no effect on an employee's grade or salary level do not constitute adverse employment action."); *Ogden v. Brennan*, 657 Fed. Appx. 232, 235 (5th Cir. 2016) (holding that a "letter of warning" does not constitute an "adverse employment action" because it does not affect "job duties, compensation, or benefits"). Since Overton has not alleged any additional employment consequences, and the letter remained in her file only temporarily, Overton has not raised any genuine dispute of material fact whether the letter of reprimand itself constitutes an adverse employment action.

In her Response to Defendant's Motion for Summary Judgment, Overton states that she does not "frame her retaliation claim as being limited to only one adverse employment action (the Letter of Reprimand)." (Doc. 72 at 7). But Overton focuses exclusively on the letter of reprimand as the only alleged adverse employment action in the supporting argument for her retaliation claim. (*See id.* at 7-10). Overton does not name a single other alleged adverse employment action in the context of her retaliation claim. To the extent that Overton refers to one of the five actions that she labels as adverse employment actions in her disparate treatment claim, because Overton provides no supporting argument, Overton raises no genuine dispute of material fact whether any of those actions constitute retaliation. Accordingly, the Court grants Defendant's Motion for Summary Judgment on the retaliation claim.

1

2                          **iii.  Hostile Work Environment Claim**

3        To establish a prima facie case for hostile work environment premised on gender

4  under Title VII, Overton must establish that (1) she was subjected to verbal or physical

5  conduct of a harassing nature that was based on her gender; (2) the conduct was

6  unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter the conditions

7  of her employment and create an abusive working environment.  *Nagar v. Foundation*

8  *Health Systems, Inc.*, 57 Fed. Appx. 304, 305 (9th Cir. 2003).  The court must "consider

9  all circumstances, including the frequency of the discriminatory conduct; its severity;

10 whether it is physically threatening or humiliating, or a mere offensive utterance; and

11 whether it unreasonably interferes with an employee's work performance."  *Davis v. Team*

12 *Elec. Co.*, 520 F.3d 1080, 1095 (9th Cir. 2008).  "Simply causing an employee offense

13 based on an isolated comment is not sufficient to create actionable harassment under Title

14 VII."  *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1113 (9th Cir. 2004).  Rather, Overton

15 must show that the workplace was so "permeated with discriminatory intimidation,

16 ridicule, and insult" that it was sufficiently "severe or pervasive to alter the conditions of

17 the victim's employment and create an abusive working environment."  *Harris v. Forklift*

18 *Systems, Inc.*, 510 U.S. 17, 21 (1993).

19        Even considering all of the examples referenced in her Response to Defendant's

20 Motion for Summary Judgment, Overton fails to establish the first element of a hostile

21 work environment claim.  Overton has failed to direct the Court to any evidence that would

22 indicate that Overton herself was subjected to objectionable conduct on the basis of her

23 gender.

24        Overton contends that the following allegations "alone establish triable issues which

25 preclude summary judgment on the hostile work environment" claim: DHS investigated

26 and disciplined Kirk for workplace misconduct; other employees filed complaints

27 regarding Kirk "belitting single moms," "shadowboxing in the office,"[3] and "making

28 _____
   [3] At oral argument, Overton's attorney highlighted two examples in the record involving
   physical conduct by Kirk where Overton was present.  First, Overton was present in an

1    inappropriate comments;" Kirk looked another employee "up and down" at a marathon;

2    and Kirk sent a photo of his wife in a bikini to other employees.  (Doc. 72 at 14-16).  But

3    Overton provides no facts suggesting that she was personally subjected to any of this

4    alleged conduct.  She cannot make out a hostile work environment claim based on alleged

5    conduct to which she was not subjected.  *See Nagar*, 57 Fed. Appx. at 305 (holding that

6    the first element of a hostile work environment claim requires the plaintiff to demonstrate

7    that "she was subjected to verbal or physical conduct of a harassing nature that was based

8    on her . . . gender").

9        Moreover, the additional allegations regarding verbal harassing conduct to which

10   Overton was subjected do not satisfy the first element of a hostile work environment claim

11   either.   Overton provides the following allegations:   Kirk gave Overton a PWP that

12   "contained unrealistic goals and she did not have adequate time to review it" (Doc. 72 at

13   16); Kirk denied Overton's request to have a female supervisor present for the PWP

14   meeting, but instead brought a third-party male supervisor to the meeting (Doc. 72 at 17;

15   add citation about male); Kirk criticized Overton's performance in the MPA role (Doc. 72

16   at 17); Kirk asked Overton to continue performing the duties in her former MSS role (Doc.

17   72 at 17); and Kirk contacted Overton on her personal cell phone while she was on annual

18   and emergency sick leave (Doc. 72 at 17).  This evidence does not show that the workplace

19   at DHS was "permeated with discriminatory intimidation, ridicule, and insult."  *Harris*,

20   510 U.S. 17, 21 (1993).  Even if, as Overton alleges, Kirk made a statement to the effect

21   that Overton should "put on her big girl panties" and "let bygones be bygones," (Doc. 72

22   at 17), the Ninth Circuit has made clear that "[s]imply causing an employee offense based

23   on an isolated comment is not sufficient to create actionable harassment under Title VII."

24   *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1113 (9th Cir. 2004).

25       Thus, Overton has failed to demonstrate a triable issue as to the existence of a

26   gender-based hostile work environment.   Accordingly, the Court grants Defendant's

27   _____

28   office that she shared with three other employees when Kirk kicked the door of the office.
     (Doc. 63-1 at 37 of 160).  Second, Overton witnessed Kirk "throw punches in the air."  (*Id.*
     at 38 of 160).  Neither of these examples support any inference of gender discrimination or
     satisfy the first element of a hostile work environment claim.

1    Motion for Summary Judgment on the hostile work environment claim.

2        **3.  Motions to Seal**

3        In the Ninth Circuit, a party seeking to seal a document must overcome a "strong

4    presumption of access to judicial records" by meeting the "compelling reasons" standard.

5    *Kamakana v. City and Cnty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006).   That is,

6    the party must "articulate compelling reasons supported by factual findings that outweigh

7    the general history of access and public policies favoring disclosure."   *Id.* (internal

8    quotations and citations omitted).   Compelling reasons must be shown "even if the

9    dispositive motion, or its attachments, were previously filed under seal or protective order."

10   *Id.* at 1179.

11       "What constitutes a 'compelling reason' is 'best left to the sound discretion of the

12   trial court.'"   *Center for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1097 (9th Cir.

13   2016) (quoting *Nixon v. Warner Commnc'ns, Inc.*, 435 U.S. 589, 597 (1978)).   Generally,

14   'compelling reasons' sufficient to outweigh the public's interest in disclosure and justify

15   sealing court records exist when such 'court files might have become a vehicle for improper

16   purposes.'"   *Kamakana*, 447 F.3d at 1179 (quoting *Nixon*, 435 U.S. at 597).   "The mere

17   fact that the production of records may lead to a litigant's embarrassment, incrimination,

18   or exposure to further litigation will not, without more, compel the court to seal its records."

19   *Id.* (citing *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1136 (9th Cir. 2003).

20       DHS requests the Court to seal the following 15 exhibits: "Exhibits 4, 5, 7, 8, 9,

21   12, 13, 15, 16, 17, 18, 19, 20, 22, 23."  (Doc. 64 at 2).  In support of its Motion to Seal,

22   DHS highlights that this Court already issued an order acknowledging the privacy of those

23   exhibits, as they "contain the identifying information of persons, including persons who

24   are federal employees."  (Doc. 64 at 1).  Yet, "even if the dispositive motion, or its

25   attachments, were previously filed under seal or protective order," DHS must still provide

26   articulable facts that show compelling reasons to seal those exhibits.  *See Kamakana*, 447

27   F.3d at 1179.  DHS states that the 15 exhibits "were obtained by the [g]overnment pursuant

28   to internal investigations in response to employment discrimination charges, without

regard to whether those charges were deemed meritorious or not." (Doc. 64 at 2). But the "mere fact that production of records may lead to a litigant's embarrassment, incrimination, or exposure to litigation will not, without more, compel the court to seal its records." *Kamakana*, 447 F.3d at 1179. DHS further argues, vaguely, that such exhibits "include internal emails, affidavits, and memoranda between government employees and/or officials concerning personnel matters." (Doc. 64 at 2). DHS thus seeks relief that is overbroad, making "blanket requests to seal a large volume of documents,[4] without offering [articulable facts] for each document or explaining why entire documents, rather than discrete portions of them, must be sealed." *See Marsteller v. MD Helicopter Inc.*, No. CV-14-01788, 2017 WL 5479927, at *2 (D. Ariz. Nov. 15, 2017) (denying motion to seal). Since DHS has failed to provide sufficient justification, Defendant's Motion to Seal is denied.

Overton requests the Court to seal the following 29 exhibits: Exhibits "6 through 31, and 33 through 35." (Doc. 70 at 1). Overton does not provide any articulable facts showing a compelling reason to seal those 29 exhibits. (*See id.* at 1-2). Nor does Overton offer any supporting argument in her Motion besides a vague statement that "29 exhibits contain content that may be governed by the Privacy Act." (*See id.*). Since Overton has failed to provide any justification, Plaintiff's Motion to Seal is denied.

**IT IS THEREFORE ORDERED** that Defendant Alejandro N. Mayorkas's Motion for Summary Judgment (Doc. 62) is granted.

**IT IS FURTHER ORDERED** that Defendant Alejandro N. Mayorkas's Motion to Seal (Doc. 64) is denied. The Clerk's Office is directed to file Doc. 65 onto the public docket bearing the same document number with the file date remaining the same.

**IT IS FURTHER ORDERED** that Plaintiff Dixie Overton's Motion to Seal (Doc. 70) is denied. The Clerk's Office is directed to file Doc. 71 onto the public docket bearing the same document number with the file date remaining the same.

/ / /

---

[4] The exhibits that DHS requests to seal amount to over 200 pages.

1        **IT IS FURTHER ORDERED** directing the Clerk of Court to terminate this action

2  and enter judgment accordingly.

3        Dated this 28th day of October, 2024.

G. Murray Snow

Senior United States District Judge